UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
---------------------------------------------------X

UNITED STATES OF AMERICA                    <u>SENTENCING MEMORANDUM</u>

    -against-                                              22-cr-00470 (WFK)


Scott Koeppel,

          Defendant
---------------------------------------------------X


**SENTENCING MEMORANDUM ON BEHALF OF SCOTT KOEPPEL**




RESPECTFULLY SUBMITTED,


<u>//s//David Jason Cohen//s//</u>
Cohen Forman Barone, LLP
BY: David J. Cohen
950 Third Avenue, 11th Floor
New York, NY 10022
david@cfblaw.com
212-766-9111

**INTRODUCTION**

Scott Koeppel (hereinafter, "Mr. Koeppel", "Scott", or "Defendant") comes before the Court for Sentencing after his plea of guilty on January 5, 2023 to having acted contrary to 26 U.S.C. § 7202 and § 7203 in his capacity as the owner and operator of Sharp Mechanical Inc. and as an individual taxpayer. A blue collar, hard-working family man his entire life, Scott finds himself in his current position as a result of an unfortunate combination of circumstances that grew and spiraled beyond his control for an extended period of time. While in retrospect, it is clear that Scott allowed his business to grow and expand beyond his own ability to properly or lawfully account for it and keep his books accurately, he recognizes he in this position due to his own frailties and his own mistakes, both omission and commission. Scott fully recognizes and concedes his wrongdoing as reflected in the charge against him, and he continues to fully admit his guilt and accept the punishment to be fixed for him by this Court.

With his sentencing date just a few short weeks away, Scott finds himself continuing to try to maintain the status quo in his business, in his family and for all the people and institutions in his orbit that depend upon him. This continues to be extremely challenging, as Mr. Koeppel continues to struggle through some of the most difficult personal circumstances of his life. Scott is, understandably, also trying to reconcile the concerns (fears, anxieties, uncertainties) about the sentence this Court will impose upon him for the series wrongheaded choices he has made, now years in the past, that has brought him to this place. Scott comes before this Court with a unique personal history and as a man who has permanently fixed the underlying mistakes in judgement and conduct that led to these offenses. Anxiously, Scott, his wife Mary, and his two children, wait and prepare to meet the weighty financial obligations he understands the Court will impose upon

the defendant for his crimes. Scott is and has been, fully committed to making up for the losses his mistakes have caused.

On Mr. Koeppel's behalf, we respectfully seek this Court's justice and mercy in conducting its analysis of the appropriate sentence to be imposed upon him for his criminal actions. After a full consideration of Mr. Koeppel as an individual, the circumstances of his life, his offending conduct, and how he is presently situated; we respectfully move this Court, to sentence Scott Koeppel to a probationary sentence with appropriate conditions including the stipulated restitution obligations.

## I.  18 U.S.C. §3553(A) FACTORS

*18 U.S.C. § 3553(a)(1) – The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant*

### The Nature and Circumstances of the Offense

Scott Koeppel has pled guilty to both counts of the information charging him under 26 U.S.C. §§ 7202, 7203, a willful failure to collect, truthfully account for and pay over tax and failure to file individual income tax returns. Specifically, Mr. Koeppel pled guilty to knowingly underreporting the earnings and wages paid to employees of Sharp Mechanical, his heating ventilation and air-conditioning (HVAC) company, and submitting false internal revenue service (IRS) Form 941s. The forms falsely understated the gross wages paid to employees, in order to avoid reporting the full amount of FICA taxes that the business owed in 2018 and as a means to assist his employees with their financial obligations. Mr. Koeppel also failed to file individual income tax returns for 2018 despite his substantial personal income earned. See, *PSR §§ 4-7*. The nature of this "tax evasion" offense is the loss of legally mandated tax revenue to the government and, thus, the public at large, through Mr. Koeppel's actions. Accordingly, there is no specific victim but rather the IRS and thus, the public and its coffers are victims here, in that they have

been deprived of the funds that should have gone to them from Sharp Mechanical, Inc. and the Mr. Koeppel himself. See, *PSR ¶ 8, 9, 16*. It is the Koeppel's fervent hope, this Court will allow Mr. Koeppel to continue to work so that he can maintain his business to meet the high financial burden that he has brought upon himself.

Scott has fully admitted his criminal responsibility to each of the elements of each crime, in that, he knowingly and willfully failed to collect, account for and pay over to the IRS the required FICA taxes from 2018 and to file personal income taxes and pay such taxes for 2018. His conduct unquestionably satisfies the elements of the crime and he is manifestly guilty. Counsel would note that it appears this was a situation where, what was a very small ("mom & pop") business grew into a much bigger business with suddenly numerous employees needed and taken on in a short period of time and Scott (along with his wife and bookkeeper) became overwhelmed. They were overwhelmed at their new volume, their obligations as employers and taxpayers, and instead of hiring the right outside professionals, or making other adjustments to their changing realities, they chose to stick their heads in the sand so to speak, knowing they were not following all their legal, tax obligations and just continuing forward with the substantive business that was coming in and being done. Counsel does urge the Court to consider that the true nature of his offending conduct was inattention and carelessness in failing to monitor the manner in which the financial aspects of the business were being managed and administered, most critically, the payroll and tax reporting aspects. To that end, Scott does not disclaim his own knowledge and consent with respect to the book-keeping practices that constituted the wrongdoing here, but, at the same time, he was not the one deciding or specifically instructing any of his employees or agents on what should or would be reported and paid to the IRS. All the same, he was aware and he was complicit, and moreover, it was his business. In recognizing all of the foregoing, Scott made the

decision some time ago to accept full responsibility for the entirety of the wrongdoing and has asked for full and exclusive punishment for the wrongdoing to fall on his own shoulders.

### *History and Characteristics of Scott Koeppel*

As the statute counsels, an understanding of who Scott Koeppel is and the life he has led, as well as consideration of the circumstances of his life at present, are essential elements in fully determining the most just and appropriately tailored sentence for him in light of the nature and circumstances of his offending conduct. It is respectfully submitted, that Mr. Koeppel's personal characteristics, as well as his status as the heart and soul of his family business and his family, and, the immense suffering, in both tangible and intangible ways that so many members of each would endure if he were removed from their lives, should be particularly strong considerations in favor of a non-custodial sentence.

As set forth in some detail in the Probation Department's report, Scott, who will turn 60 this coming January, is one of three (3) children of his mother, Francis and his father, Ellis, now divorced, both retired and living in Nassau County, Long Island. *PSR 31-33*. Scott remains close to his parents as well as his younger sister, Pamela, who is a married mother of three and has been employed for many years in the Melville school system. Scott's only brother, Andrew, is and has been fully disabled for more than two (2) decades and is cared for full-time by their mother, living with her in her home. Andrew has not spoken nor moved any muscle in his body for more than twenty (20) years. The most serious of the diagnoses for Andrew Koeppel is Anoxic Brain Damage with total Quadriplegia.[1] Scott is and has been the primary source of financial support

---

[1] See, Exhibit C, *Letter of Dr. Michael Goodman* (re: Andrew Koeppel).

for his brother and his mother for decades. The medical bills to keep his brother Andrew "alive" are astronomical. What little assistance there is from medical programs, represent but a fraction of the costs associated with Andrew's care. However, it is Scott and Andrew's mother's desire to *not take her son off* the life support systems that require large amounts of money and permit Frances to say that her son, Andrew, is still "alive". It is the saddest of scenarios for the Koeppel family. But, Scott has been trying to honor his mother's wishes and spending tens of thousands of dollars a year on his brother's care, who remains in a vegetative state. His brother lays in a hospital bed in his mother's house. He does not move, does not speak, has limited brain functioning and does not respond to outside stimuli. Scott has never wavered in his commitment to supporting the care of Andrew even during this prolonged period of his own legal and financial woes as well as battling his own cluster of health problems and those confronting his wife, Mary. Without the defendant's assistance, his brother would have been deceased a long time ago.

Scott's father, Ellis, worked for NYPD for 27 years, rising up to become a detective. Scott's mother remained at home as a homemaker. Growing up, for Scott and his siblings, the family resided in Canarsie, Brooklyn. It was after the children reached adulthood that his parents moved out to Merrick in Nassau County which is where his parents separated. Although Scott enjoyed a childhood where basic needs were met and he and his siblings were always provided for, either by their parents or grandparents, it was (in contrast to the probation department report's characterization[2]) a troubled household, fraught with domestic strife. His father suffered from chronic gambling addiction. Not surprisingly, this proved to be very tumultuous for the household. There were dozens of occasions where the defendant's father lost such great quantities of money that his, or his wife's parents, were forced to step in and help. Scott would witness, his

---

[2] See, *PSR ¶ 33* (characterizing his as a "happy childhood").

grandparents on both sides having to pay the families' rent, buy groceries, presents for the children or basic household and school expenses for the children. The scars, embarrassment and determination to never have to ask anyone for anything continued to burn in Mr. Koeppel for a long time after moving out from his parent's home. Scott adored his dad but his dad's deceitfulness toward the family did not end with his gambling problems. His father was also unfaithful to his mother for years. Having various mistresses and women on the side. Scott recalls a home life where constant fighting, resentment, deception and turmoil were the norm. Scott turned to working to get away from the domestic strife. But his older brother, Andrew, was not so "fortunate". From a young age, after seeing and hearing all the arguments, fighting, the calls to the grandparents for help, Andrew turned to drugs. And, it has basically killed him. Andrew struggled, from early adolescence, with substance abuse. It was a near fatal overdose in 2000 that left him with brain damage, unable to walk, talk or care for himself. See, *PSR § 32.* Scott has always supported Andrew and his care and condition is one of many institutions in Scott's life where his faithful and continuing support is essential to maintaining the status quo and avoiding unnecessary suffering of third parties.

Scott has been married to his wife, Mary Guberman, for over 25 years[3] and they are the proud parents of a son, Robert (18) and elder daughter, Samantha (21). Robert is a recent high school graduate who will be starting as an undergraduate in January of 2024; while Samantha is in her third year of her studies[4], majoring in business marketing at L.I.U. Post. See, Exh. C, *Samantha Koeppel, 2023 Dean's List Letters, Enrollment and Tuition Payment Materials.* Both of Scott's children have lived wholly law-abiding. They have been under their parent's care and

---

[3] See, Exh. B, *Marriage Certificate*, see also, Exh. A, *Statement of Rabbi, Joseph Potasnik* (regarding having married the couple in 1998 and attesting to Scott's good moral character and his extensive charitable work and altruism over the decades since).

[4] The PSR incorrectly states that Samantha is a recent college graduate. She is currently matriculating.

are not reliant on anyone other than themselves and their parents. Their home life has been the opposite of the one the defendant grew up in. And, this was one of the most important goals Scott had set for himself as a parent. To provide a stable home for his children. Scott does not drink, use drugs, or gamble. Scott and Mary do not fight or yell in front of the children. Moreover, each of Scott and Mary's children, remain reliant on the continuing financial assistance support their parents are able to provide as they continue forward in their collegiate studies and look forward to beginning their own careers in the years ahead. Any sentence of imprisonment imposed upon their father would represent an earthquake in the lives of both of these young people. While it would unquestionably create financial and practical hardships for them in myriad, significant ways, it would also be emotionally devastating and disillusioning. It would undoubtedly be a traumatic event for them as it would be for Mary and for Scott himself who has never been in jail, prison or any other detained setting, in his 59 years.

Mary, Scott's loving spouse and partner in life and raising their children, works with Scott and has been an employee and officer of Sharp Mechanical Inc. since the company was founded in 2013. Additionally, Scott has fully embraced his Mary's family as his own; and, the love and dedication he has shown all of them is evident in the support they have collectively provided to him at this point of personal reckoning. See, Exh. A, *Statements of Guberman Family Members*. Mary is currently facing a variety of health problems which have greatly increased due to the stress of recent years (including the investigation and prosecution of this matter) as well the exacerbation of several conditions after hospitalization for COVID-19 in 2021. See, *PSR § 34.* As it stands, she is scheduled to undergo abdominal surgery in late December of this year which will necessitate several weeks recovery where she would be unable to care for herself adequately. The defendant would be her caretaker; and, she would be severely disadvantaged and partially incapacitated

without the help her husband would need to provide. See, <u>Exh. C</u>, *Long Island Laproscopic Surgery Letter, October 13, 2023*. As related in the probation department's interview with Mary, she is extremely emotional about this case and Scott's conviction and impending sentence. She is distraught and is consumed by her worries and anxieties about how she could try to manage keeping their business viable and afloat, their business and personal finances and expenses, including the court-ordered restitution obligations to be imposed, the children's education, their home, and legions of inter-related and additional costs and concerns. See generally, *PSR ¶¶ 34-35*. While Mary would undoubtedly be the person, beyond Scott himself, who would suffer most severely, if he were imprisoned for any substantial period of time; she would also be the conduit between him (an imprisoned Scott) and their world. She would absorb and experience the hardships and suffering of other family members, employees and their families, and other organizations and people in the community who depend and have come to rely upon the defendant and the positive things he does, every day. This would be the best-case scenario, presuming the business did not fail due to Scott's absence.

While Andrew succumbed to his addiction, Scott and his sister Pamela both emerged from their challenging childhoods well-adjusted and capable; and, both have lived significantly admirable, law-abiding lives of substance and achievement until Scott's present troubles. Since he entered the professional world some 40 years ago, Scott has focused on the heating, ventilation and air-conditioning (HVAC) field, with a focus on contracting and installation for large scale construction projects. Over many years and the development of a sterling reputation in his business community, Scott has become a recognized and trusted local leader within the industry. See generally, <u>Exh. A</u>, *Statements of Numerous Clients, Colleagues, Peers*. Scott's colleagues, across the board, note his honesty, professionalism and dependability, but also his generosity and

genuinely caring nature when it comes to his fellow man.  See, *Statements of Ira Victor, Solomon Sam and Robin Silverstein* at Exh. A.

As an entrepreneur, and as an employer, Scott has also made an enormous positive difference in the lives of many. Scott has not only hired, but inspired, scores of people who often had few other options, besides Scott and his company, that were willing to take a chance and make an investment in them. See generally, Exh. A, *Statements of Omar Velasquez, Jose Reyes, Carlos Jurado, Kevin Serrano, and Eric Ramirez*. Scott's philosophy has always been to find individuals with a strong desire to work hard so they can achieve tangible goals in their lives and for their families; and then provide an opportunity for those persons to excel by showing them, through his own approach and follow through with the work, the type of diligence required for them to be able to succeed. This approach has been hugely beneficial not just for Scott as a business owner and team leader but for his individual employees, many of whom regard Scott as someone who has changed their lives for the better, forever. *Id.* see*, Statement of Omar Velasquez* ("I can genuinely say he has been more than mentor to me. He has been the reason I have so much knowledge and have accomplished so much in life. I have been given the opportunity to provide for my family in better ways than I could've ever imagined…a life that as a kid I could only dream of.").  Scott has provided for men down on their luck, with little formal training, no family to help them or simply people who needed a second chance.  He looks at the person, more than their past, and has given dozens of second chances to employees who other potential bosses tossed aside because of their background. Mr. Koeppel's business is founded on the hard work of those whom Scott believed in when others did not.

Although the business was nearly shuttered due to the onset of the COVID-19 pandemic and the extended shutdowns, Scott worked tirelessly to find ways to keep workers employed and

keep the business afloat and the needs of all his employees met, even when the work stopped[5]. Scott has always been a workaholic. He drives from Long Island, leaving before dawn sometimes at 4:00am to get to Brooklyn, The Bronx or Manhattan to meet his guys by 6:00am. He stays at various jobs throughout the day, meets with his vendors, talks with various suppliers and is at the jobs when his workers conclude their days. He tries to drum up business by meeting with owners and managers of the business(es) that hire him and often would not return home till 10:00pm. To a person: his wife, his kids, his in-laws, his workers (whom often come to his house before dawn for pre-work breakfasts) the people who hire his company, describe Scott as a 7-day a week worker. His business survives because of the effort of Scott Koeppel. He gave up some of his own salary to keep his workers busy during the COVID-19 pandemic. This was a Herculean task, not only because everything was put on pause, the supply chain was stopped and the cost of goods had skyrocketed, but Scott and Mary each had their own mounting health problems[6], his parents and his brother continued to require more time, attention and resources to support than ever before and his children were also entering and beginning their matriculation in college[7]. All of this, of course, coincided with the enduring legal and financial problems incurred as a result of addressing the case at bar.

Today, the business is rebounding, continuing to employ numerous workers. Scott's constant dedication and attention to maintaining the critical business relationships of the past, has enabled them to weather the storm, despite the many challenges they confronted and continue to confront due to his mistakes that have led him into his present circumstances facing sentence. It

---

[5] See, Exh. A, *Statements of Omar Velasquez, Jose Reyes, Carlos Jurado, Kevin Serrano, and Eric Ramirez.*
[6] Exhs. C & D, *Medical Records, Doctors' Letters and Prescriptions List* addressing Mary and Scott's medical conditions and health considerations which are discussed in greater detail, *infra*, addressing 18 U.S.C. § 3553(a)(2)(D).
[7] Exh. C, *Samantha Koeppel, College Documents.*

has not been easy to stay afloat in recent years. However, Scott has consistently worked extended hours, often through serious pain and physical[8] discomfort, mental and emotional anguish (ever-mindful of the serious mistakes he has made and consequences he and those closest to him will bear as a result). He does this because he understands how much his workers and his family and so many others in his personal and professional spheres and networks depend on him to maintain their livelihoods, their charitable and community services missions[9] and general well-being.

It is nearly impossible to separate the business and the personal lives of Scott Koeppel. He is a father of two (2), now grown and well-adjusted and positioned young adults, a devoted partner and husband to Mary, and the love of each other's lives. Scott is and has been, involved in the lives of many of his extended family members over the years, filling in crucial emotional and supportive gaps for his nieces and nephews, on his wife's side, during times of personal struggle and need. See, Exh. A, *Statements of David, Mitchel, Steven, Lauren, and Aisha Guberman.* His brother-in-law describes Scott's dedication to family, both in his work to adapt the home for his father-in-law's decline, as well as Scott having shouldered all logistical duties for the family when he eventually passed. He also speaks to Scott's commitment to caring for and enriching the life of his autistic nephew. See, Exh. A, *David Guberman*.

Some of the poignant statements of others to whom Scott has become close over the years, while describing his character, his devotion to helping and providing for not just all members of his family (including his business family of employees and coworkers) but his community and

---

[8] Scott has certainly put his own health and well-being far down on his list of priorities in recent years while attempting maintain his business and his staff, and continue to fill all of his many critical roles in his family and community. See, Exh. D, *Defendant's List of Prescriptions and ongoing Dental Surgical Treatment Plan.*

[9] See, Exh. A, Statements of numerous individuals, describing Scott's sustained and dedicated participation and leadership in their charity and benefit organizations, events and efforts over many years.

society in general, are particularly apt in demonstrating to this Honorable Court, who Scott Koeppel truly is:

"In 2007, I was diagnosed with breast cancer. Scott and his wife were there for me when I thought my world was falling apart…(a)bout 10 years ago I held a fundraiser to raise money and awareness for Breast Cancer…Scott and his family attended (and) he helped gather crowds (and) was exceptionally kind to all of the people and their dogs who attended. (W)e decided to hold additional fundraisers over the years and I can assure you that Scott and his family did not miss one!" – *Elizabeth Patricola, Dog Groomer, Breast Cancer Survivor and Charity Organizer* (see, <u>Exh. A</u>).

"(O)ur 23-year association…has transcended from running a non-profit business to becoming a genuine friendship which speaks volumes about Scott's character…Scott's contribution allowed our client who has been suffering from ALS to have a Meet & Greet with Breaking Benjamin[10] and experience the concert from the stage with his sister." – *John Anthony White, CEO – A1 Entertainment Events Inc. (Non-Profit Organizer)* (see, <u>Exh. A</u>).

"At Thanksgiving time, Scott donated a truckload of turkeys to a poverty-stricken inner-city area[11]. It has been my pleasure to know and deal with Scott. I have been impressed and humbled by his kindness and generosity." -*Scott Gibbons, Manager, Butcher Boy Prime Meats and Catering* (see, <u>Exh. A</u>).

"I have witnessed Scott's strong commitment to his community and his dedication to helping those in need. He has frequently made contributions to religious and charitable organizations in need of support. He has selflessly given his HVAC/heating services to congregations (sic) pro bono and assisted members of the community that could not afford critical repairs." – *Rabbi, Joseph Potasnik* (see, <u>Exh. A</u>).

---

[10] An American Rock Band (with which counsel is regrettably unfamiliar).
[11] See correspondence receipts and photographs at <u>Exh. E</u>, *Evidence & Material concerning Charity and Community Service*.

"Scott was very kind to me while I had cancer in 2018. I had issues with my heating system and when I reached out to him, he was more than willing to me with the cost of parts and labor, since I was unable to afford the repair due to my illness." – *Anne Marie Giron (*see, <u>Exh. A</u>).

"I once had a store in downtown NYC that had no heat in the middle of the January. We were at risk of having the store close down…even more importantly the pipes could burst causing product damage. Scott was able to find the parts needed to get the store up and running." – *Tricia Kennedy* (see, <u>Exh. A</u>).

Scott Koeppel's charitable giving and his overarching compassion for both his fellow humans and animals alike is perhaps his most demonstrable and defining characteristic, alongside his unwavering and constant dedication to taking care of his family. Indeed, Scott has been a supporter of the Suffolk County SPCA, the ASPCA, the North Shore Horse Rescue and Sanctuary while also remaining a champion to the downtrodden and less fortunate and show his children how to think in terms of service to their human community. See, <u>Exh. E</u>, *Evidence of Charitable Giving and Community Outreach of Defendant and Family* Even as the onset of the pandemic hit, Scott always continued to prioritize charity and giving, to support veterans' organizations, as well as programs to access education and food for the needy. <u>Id</u>. Needless to say, Scott and Mary realize that their ability to continue to give and support the many charities and non-profits they have always so happily worked with over the years, is going to be severely compromised in the years ahead. It is with foreboding that they also consider the further possibility of any period of imprisonment for Scott delivering an end to the business and thus to their livelihood as well as those less fortunate who have come to rely on Scott's generosity for some of their basic needs.

*18 U.S.C. § 3553(a)(2)(A) – the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense*

It is important that there be no confusion that Scott Koeppel comes before this Court fully recognizing the seriousness of the offenses he has committed, the harm to the government, and thus, society as a whole, his actions caused. A man raised in a family where respect for both the law of man and God were elevated above all else, Scott thoroughly understands the importance of consequences and punishment in the shaping of good habits, correction of improper behavior, and in molding and shaping an individual who can exhibit them. In a very real sense, Scott fully appreciates and has come to internalize the understanding that the sentence he faces and the significant obligations it will impose, in addition to the limitation on his autonomy throughout the pendency of his case, are all brought about by his own actions and poor choices that have led him into the position where he now finds himself.

*18 U.S.C. § 3553(a)(2)(B) – The Need for the Sentence Imposed to Afford Adequate Deterrence to Criminal Activity*

Beyond the need for the imposed sentence to deter Scott from reoffending[12], a sentence of non-incarceration which incorporates the full restitution he must make to the government, and imposes continued monitoring, supervision, and other appropriate conditions, nevertheless, adequately reflects the seriousness of the offense.  Such a sentence would also exhibit to the community that engaging in this type of criminal behavior will be punished by real and substantial consequences for such offenders. Importantly, in fixing a carefully considered and individualized sentence for the defendant, based upon his unique history and circumstances as well as the full

---

[12] This concept of "specific deterrence" to Mr. Koeppel from reoffending is addressed *infra*, in the discussion of 18 U.S.C. § 3553 (a)(2)(C).

context and nature of the specific offending and the specific harm caused, the Court demonstrates its exclusive ability to fix the correct and just punishment for each individual that comes before it. In a society where the populous sees that justice for each individual defendant is in fact flowing from the Court, after a measured consideration of all relevant circumstances, a respect for the law and for law-abiding behavior grows the strongest, the most quickly, and is most enduring.

*18 U.S.C. § 3553(a)(2)(C) – The Need for the Sentence Imposed to Protect the Public from Further Crimes of the Defendant*

Given the nature of the offending conduct and the manner in which the repercussions of the offense, conviction and anticipated restitution requirements, will continue to significantly impact Scott personally and professionally well into his seventh decade of life[13], the defense respectfully submits that the risk of him again running afoul or the IRS and his tax obligations is unimaginable. See generally, <u>Exh. G-I</u>, *Defendant's Personal & Business IRS Tax Filings 2020-2022*. A custodial sentence would do no more to protect the public from future crimes- like those that he has committed here- than would a probationary sentence with conditions and court-ordered restitution obligations. Moreover, as this is his only conviction of record[14], there is no basis upon which to find any reasonable concern that Scott would become involved, at his age, and in the life that he leads day in and day out, with some other, different type of criminal conduct.  All data suggest, that at 60 years old the likelihood of reoffending is remote.

---

[13] He is presently 59 years of age already. See, *PSR ¶31.*
[14] Scott is a "0-point offender", as set forth at *PSR ¶26.*

*18 U.S.C. § 3553(a)(2)(D) – the need for the sentence imposed to provide the defendant with needed educational of vocational training, medical care, or other correctional treatment in the most effective manner*

Another factor that supports a non-custodial sentence beyond even the defendant's age, is his own substantial, ongoing medical conditions and treatment needs. As explained by his current caregiver, Scott is presently being treated diabetes, hypertensions, high cholesterol and hyperthyroidism for which he takes an ever-shifting combination of medications. See, <u>Exh. D</u>, *Defendant's Medical Letters and Records*. Scott has also been experiencing significant dental problems of late requiring complicated and expensive oral surgery consisting of multiple extractions and a bone graft. <u>Id</u>. *Dental Treatment Plan*. When Scott's own medical conditions and treatment needs as a man entering his 60's are considered, alongside the impending surgery and recovery period for his wife, the defense respectfully submits that these circumstances support the request for a noncustodial sentence that will best enable both of them to address their medical needs without undue suffering or incurring expense to the public for the satisfaction of such needs.

*18 U.S.C. § 3553(a)(3) – The Kinds of Sentences Available*

The Court has before it a substantial range of sentencing options. The offenses for which Mr. Koeppel now stands for sentencing, are those to which no mandatory minimum sentence is assigned by statute; and, whose maximums term of imprisonment are one (1) and five (5) years, respectively. See, 26 U.S.C. §§ 7203, 7202. The defense respectfully submits that the calculated offense level and the corresponding advisory Guideline range for of periods of incarceration, far exceed what is sufficient or necessary in this case. The Court, is vested with the discretion to sentence Mr. Koeppel to a probation only sentence with restitution and other conditions. In consideration of the totality of the circumstances, should the Court concur with the defense that a

downward variance is indeed warranted, then we urge the Court to mete out the sought after, non-custodial sentence.

*18 U.S.C. § 3553(a)(4) – The Guidelines and Guideline Range*

The 2021 Guidelines Manual applies to this case and, pursuant to U.S.S.G. §§ 2T1.6(a) and 2T4.1(H), the base offense level is 20; due to the grouping analysis under U.S.S.G. § 3D1.2(d) where the offense level is determined by aggregated quantity of the offenses taken as whole. See, *PSR ¶14;* see also U.S.S.G. § 3D1.3(b); see also, U.S.S.G. § 3D1.3, App. Note 3.[15]

Pursuant to U.S.S.G. §§3E1.1(a) and (b), three (3) levels are deducted for acceptance of responsibility and entering a guilty plea reducing the offense level to 17. See, *PSR ¶¶ 21-22*. Moreover, as Scott is a "0-point offender" under the recently amended Guidelines[16] that took affect November 1, 2023, he receives an additional reduction of two (2) levels, leaving his total offense level at fifteen (15). Under the Guidelines, for an offender with a Criminal History Category I, the total offense level of 15 carries a range of imprisonment of 18-24 months.

As is frequently the case, the Guidelines computation, as applied to Scott Koeppel, simply does not reflect a recommended sentence that is close to approximating what is sufficient, *but not greater than necessary,* to meet the important goals of sentencing set forth under 18 U.S.C. § 3553(a). The probation department, notes certain case-specific factors and circumstances that are clearly present here and would constitute mitigating factors in favor of a variance outside (below) the advisory guideline range. See, *PSR § 67* (Noting Scott's status as the sole proprietor of his business which, would almost certainly be shuttered as a result of a substantial prison sentence, would be certain to cause significant hardship to many including his immediate family members

---

[15] The government and defense counsel are in agreement that the PSR contains the correct Guideline calculation and the one contained in the plea agreement is incorrect.
[16] See, U.S.S.G. § 4C1.1.

as well as his employees and their families). Indeed, as discussed at length, *supra*, the hardships that would ensue in the event the Court fixes any lengthy sentence of imprisonment, would be shouldered by many and in a variety ways and levels of severity; many would be detrimentally impacted and suffer unnecessarily as a result of losing the support, opportunities, and their quality of life their personal or professional relationship with Scott enabled them to have.

*18 U.S.C. § 3553(a)(5) – Any Pertinent Policy Statement issued by the Sentencing Commission*

There does not appear to be any applicable policy statement of the Sentencing Commission that is applicable to Mr. Koeppel's conviction or case.

*18 U.S.C. § 3553(a)(6) - The Need to Avoid Unwarranted Disparities in Sentencing of Similarly Situated Defendants Convicted of Similar Conduct*

Scott and his defense team certainly recognize the significant period of imprisonment this Court *could* impose for his criminal transgressions in this case. While the defense appreciates the gravity of the sentencing exposure Mr. Koeppel faces, it is, nevertheless, the defense's position that consideration of similarly situated defendants convicted of the same type of conduct, along with the individualized consideration of him as a person and the nature of his offending, (in addition to the other important statutory considerations addressed, *supra*,) strongly militates in favor of a non-custodial sentence.

Statistically speaking, well less than half (11 of 27) of the offenders convicted of tax related offenses in this district in 2022, were given "prison only" sentences. During the same period, 51.8% received a sentence of either "probation only" or "probation and alternatives", as Mr. Koeppel and his defense team are requesting. See, Exh. J, *USSC, Statistical Information Packet,*

*Fiscal Year 2022, Eastern District of New York*, *Table 5*. Stepping back from this specific type of offense, offenders in the EDNY generally, were only sentenced within the computed Guidelines' range 21.9% of the time in 2022. In that same period, nearly 50%[17] received a downward variance, as the defense is asking this Court to do for Scott Koeppel and as the probation department has suggested may be appropriate under the circumstances. A wider comparison only further reinforces these statistically realities, as 55.1% of offenders across the entire Second Circuit in 2022, received a variance from their Guideline' range in the imposition of their sentences. Exh. J, *Table 9*.

While the defendant is seeking a non-custodial sentence, the Court has options beyond just probation. The Court may find that electronic monitoring is necessary. Or, a requirement that for a period of time, Mr. Koeppel can only leave his home while working for his business. There can be travel restrictions, Court ordered community service, even some form of house arrest.


*18 U.S.C. § 3553(a)(7) – The Need to Provide Restitution to Victims*

The victim in this case is, as noted above, the United States government, and, by extension, the taxpayers who have been deprived of Scott's company's duly and lawfully owed taxes. Scott has, for years now, recognized that he will be required to shoulder the very significant restitution amount set forth in the plea agreement[18] and which all parties anticipate the Court will order[19] at his sentencing proceedings.

As a small business owner, Scott's entire income is derived from the profits of his business and his ability to pay the restitution that the Court will order will come exclusively from his own continued industry and toil going forward. As many of his loved ones and employees attest to,

---

[17] See, Exh. J, *Table 8* (38.6% of offenders received a downward variance from the Court that was not initiated, proposed or stipulated to by the prosecution).
[18] See, *Plea Agreement ¶ 1(e) (counts one and two)*.
[19] 18 U.S.C. § 3663(a)(3); see also, *PSR ¶ 9*.

Scott is the engine that makes the business run; without him, the business would crumble and die. See generally, Exh. A, *Statements of Family & Employees*. Placing Scott in custody, will mean removing him from the day-to-day operations from this business that he alone owns, manages and drives moment-to-moment for over a decade, which, over any extended period of time, would be the death knell for this (family[20]) business. The demise of the business would, in turn, render it nearly impossible for Scott to earn any substantial living as a man, already on the cusp of 60, with serious and increasingly afflicting health problems, attempting to reenter society after serving a federal prison sentence, and without any manner of livelihood to return to. Even setting aside his serious health concerns and the litany of other hardships to his loved ones, employees and their families that will necessarily go hand-in-hand with any period of incarceration, so too, will Scott's ability to make full and timely restitution be severely compromised by any custodial sentence.

*Conclusion - Sentencing Recommendation*

Considering all the factors set forth in 18 U.S.C. §3553(a), counsel and Scott Koeppel humbly and respectfully request the Court to sentence the defendant to a non-prison sentence that will allow him to continue to work, keep the business afloat, and earn the income necessary to complete the significant financial conditions of his sentence. Moreover, Scott's well-documented, sustained commitment to helping his community and society in general throughout his life also strongly militates in favor of non-incarceration for this defendant who is 59 years old and has no prior conviction or incarceration history of any kind. A non-custodial sentence will also be significant in preventing unnecessary further hardship and suffering from inuring to Scott's loving wife, Mary, who will need to Scott more than ever, as they prepare to face and hope to address the

---

[20] As noted, *supra*, Mary has served as Scott's bookkeeper and office assistant for many years.

weighty financial obligations this Court will be ordering. A non-prison sentence will also avoid further suffering and hardship to Scott's children, his parents and the disabled brother he has loved and supported financially for decades as well. A non-custodial sentence will allow Scott (and Mary) to maintain the business and keep their employees and families with a source of reliable and steady income. Without Scott there to run the business day-to-day, the business will fall apart and go under in a relatively short time.

The defendant has accepted responsibility for his wrongdoing and acknowledged his guilt from the very outset of the prosecution against him. The defendant's acknowledgement has saved the government time and valuable resources allowing them to expend those limited resources elsewhere. Perhaps even more importantly, Scott has taken fully responsibility for the entirety of the criminal offending acts attributable to the company and himself, satisfying the government in so doing, that no other loved ones or family members would need be held accountable. He was completely cooperative with the IRS agents form the very beginning.  Mr. Koeppel provided the IRS with all the documentation necessary for them to provide a comprehensive report to the government. He neither hid from his wrongdoing or attempted to cover it up front the IRS when they came to him.  His case has been ongoing for years and there have been no new infractions, all of the flaws and mistakes of the past have been cleaned up and the business is returning after the (worldwide) issues accompanying the COVID-19 pandemic.  Mr. Koeppel has proven that he has learned his lessons and has already begun to make amends.

Given consideration of the totality of the circumstances and a full consideration of the statutory factors as applied to this case, a probationary sentence coupled with court-ordered restitution and other appropriate conditions is sufficient, but not greater than necessary to meet the important goals of sentencing. This recommendation is in keeping with the even-handed spirit of

the "parsimony provision" of 18 U.S.C. § 3553(a), and the defendant, through counsel, respectfully submits that the recommended sentence strikes the appropriate even balance between justice and mercy.

RESPECTFULLY SUBMITTED,

//s//David Jason Cohen//s//
Cohen Forman Barone, LLP
BY: David J. Cohen
950 Third Avenue, 11th Floor
New York, NY 10022
david@cfblaw.com
212-766-9111